The cases this morning, the first two are number 18-2894 and 18-2119. It's Maud v. Optum and Maud v. National Imaging Associates, Inc., Mr. Bach, Mr. Bauman, am I pronouncing that correctly? Bachman. Bauman, I'm sorry, and Ms. Ellsworth. Welcome. Are we hearing these two cases simultaneously? Yeah, it's 20 minutes, 10 minutes aside for the Appellees, NIA and Optum. So the appellant is going to be addressing both cases? That's correct. Is that right, Mr. Bach? Yes, Your Honor. Okay. Good morning, Your Honors. May it please the Court, my name is Philip Bach, and I'm here on behalf of the Plaintiff Appellant. May I reserve five minutes for rebuttal? Sure. The defendants sent unwanted and unsolicited facsimiles to plaintiffs. The faxes that issue fall within the TCPA's broad definition of advertisement because they contain material advertising the commercial availability or quality of the services or goods the defendants sell. Both faxes promote goods or services that are for sale. Which one do you want to address first, NIA or Optum? NIA, Your Honor. Okay, let's do that. What goods and services specifically are being promoted in the NIA fax? So NIA's, the service that NIA sells is preauthorization services for insurance companies. And so medical providers have to get preauthorization, in this case for radiological services by some other doctor. NIA has to authorize that in advance on behalf of some insurance company. Here the fax is all about the quality of their services. It's in the... So that's what makes it an ad in your view? Yes, it's promoting the quality of their services because it's asking providers to affirm how great they are. It's telling them they're... You can also tell them they weren't so great, right? Well... There's a big box at the bottom where they can say whatever they need to say. That's true, but the whole point of it is that it's only for their purpose. It's only about the quality of their services, and it's sent at plaintiff's cost. Plaintiff gets a fax from somebody for their own business purposes, either because they want to be in a position to market themselves competitively to the providers, if the provider has a choice, or to market the survey results to the people who hire them because they're in a competitive market. It's not a survey about... It's not an individual survey. It even has a copyright claim at the bottom. So this is their general provider survey. Fax this to everybody. And they can fax it to everybody if they get permission or they have an opt-out notice. The TCPA forbids faxing unsolicited advertisements. Where does it say in the... Looking at the one-page fax, Order Provider Satisfaction Survey, where does it say or act as a pretext for advertising services? The pretext would be that it's part of a larger marketing scheme, gathering results about the quality of their services to then market to other people. And Dr. Moth, the allegation is that had no prior relationship at all with NIA? The complaint says that he doesn't have an established business relationship. This was a 12B6 complaint. I'm asking what does the complaint... Does he have a prior relationship at all with NIA? His office has had interactions. I don't know how many or whether they predate the facts at issue. They must because it wouldn't make any sense to send this to strangers. Well, I thought that there was an allegation that this survey was sent to 39 groups that provided services, medical services. Is that correct? That's the numerosity allegation for class certification. We allege that they sent it to more than 39 people, other people, because courts have said 40 is the bare minimum for me. But do you really... What backup do you have for that? Just that it's a generic survey. It's available on the website. What backup do you have that they sent it to at least 39 other people or medical practices? Just good faith basis of doing these cases for a long time and knowing that these form faxes are sent to en masse. It's not sent on an individual basis. It's not about a particular transaction. It doesn't mention one. It even has an option at the bottom that says I didn't even have an interaction. But you made an allegation that it was sent to at least 40, and what I'm asking is what was the basis for that allegation other than in my practice I normally understand that these types of things are done en masse. I'm not sure that quite gets us there. Certainly, if you get to summary judgment, it won't get you there. Well, we would do discovery about how many people they sent it to, but it has a provider number on it. It's from provider feedback as the sender. It's got a copyright claim. It's just an obvious form that's sent to en masse. It's not sent to one person. They didn't create this to send to Dr. Mowdy. You just said a few minutes ago that it wouldn't make sense to send it to strangers, correct? Correct. Isn't that what advertising is all about, reaching out to strangers and increasing your footprint? No, advertising, a lot of companies think the best customer is somebody you're already dealing with. It's more expensive to get new people than it is to deal with people you've already got. Now, Dr. Mowdy is not a customer. Whoever the insurance company is is their customer. But they're trying to satisfy somebody with providers being satisfied with how they're interacting. Otherwise, they wouldn't interact. No, they're not trying to satisfy your client. They're trying to satisfy a third party. You said they weren't trying to satisfy Dr. Mowdy, right? Right, not with this fax. Okay, so who were they trying to satisfy? I mean, they're gauging the satisfaction of surveys. Who were they trying to satisfy? It's an ad, so they must be reaching out to somebody. Well, they would try to satisfy the customers that they work for. So Hartford Insurance hires them. Hartford Insurance probably can choose between competitors, NIA and ABC. How is that an advertisement to your client? It's that it's a fax. It's for a commercial purpose, for the defendant's own purpose, and it promotes the quality of their services. And it's sent without permission. What is it that the defendant wants your client to do? You're selling them something. What are you selling them? Well, what they want from the plaintiff is valuable information about the quality of their services, how good it was. Why is that selling them something? Well, it's trying to acquire something from them. The statute doesn't say that it applies only to offers to sell. It applies to offers to buy. The FCC has said it applies to offers for free things. As a pretext for an advertisement. Yeah. That's the context of free. There's nothing free here. Well, the free is they want your information for free. If they'd said, Dr. Maldi, please provide your information in exchange for $50, then it would be obvious that they're trying to buy his information for $50. But they don't say that. They want it for free. And they're going to use it for their own purposes. And the point is for them to profit. And the only thing they need to do before they send something like this is have permission or have an opt-out notice. Let's dig down a little further on did Dr. Maldi have any, you're saying may have had prior interactions with NIA. Is that correct? Yes. The complaint alleges that he doesn't have an established business relationship. In your knowledge, what was the prior relationship or prior knowledge of each other or prior interaction, even though it wasn't necessarily on a full commercial basis? That's not in the record. But what it would be is his office needed preauthorization for some patient to get an MRI, for example, from an MRI provider who says, I don't provide those unless I know I'm going to get paid. So Dr. Maldi's office has to deal with the insurance company to make sure he's going to get paid. The insurance company must say, deal with NIA, send them the records or whatever. So NIA is in the middle. Is that the same for Optum, by the way? No. Optum is different because Optum is sending, I don't know whether Optum had any previous engagement with Dr. Maldi's office. But their fax is saying, hey, we have information about you. We want more because we're putting it together to sell or license to insurance companies. It looks like Optum was not so much trying to make known of its services, but was merely trying to get information, was it not? It was not. It was not. They do make known their product and what it's for. If they just sent a fax that said, send me your provider information, with no other explanation or anything, nobody would respond and they said that. And they have this frequently asked question. People go on there to say, to look and see, what do you need my information for? And they say it's to provide, to put together a database that they license to health insurance companies. What, if anything, or how would you interpret this fax in the context of the Sandusky opinion, the Sixth Circuit opinion? The Optum? Yeah. Sandusky was about something that had already been compensated and they were sending around a notice of this list of pharmaceuticals. This is different because. We're making them aware of those pharmaceuticals, right? Yeah, but not for, not, they'd already been paid to put it together and they weren't being paid to notify anybody. Here Optum is trying to get the information so that it can get paid. Sandusky said, a fax must promote goods or services that are for sale and the sender must have profit as a name. And that's what the Optum fax does. It says, hey, we have this database that's valuable to people and that you should have your information in there so that they'll be able to find you and send this back. And they said that the reason they send it by fax is because. The Optum fax or the NIA fax? Optum fax. Okay. Isn't the Optum fax exactly what it says? It is a request for data. Well, it's more than that though. Well, yes, it is that. It does. Anything in the record that suggests that Optum's fax is a pretext for advertising. Yes. The deposition at the deposition, the person testified. Marketing materials. So Optum is not 12B6? Optum was a summary judgment. Okay. Optum uses. And what happened to the deposition? Go ahead. Optum, I don't know if it was in the documents, the marketing materials or in the deposition because the person testified about the marketing materials. But anyway, what is there in the record that suggests that it's fax, whether it be a deposition or elsewhere, it's a pretext for advertising. It's part of a larger marketing scheme, basically. They go to the people who licensed this and say, here's how we get this data. Here's why it's good. We send faxes to doctors and we get their information. Otherwise, you're just selling a database and people don't know whether it's reliable or not. So they say that they send these faxes as part of the reliability of the database. So when you look at the statute, the TCPA or the regulation that implements it, what's the textual argument for concluding that the fax is an advertisement for Optum? That it promotes the availability of the product that they sell. It also promotes the quality. And it's sent for. It promotes the availability of the product. The product is their database. They call it a database product as part of our data maintenance of our optimum provider database product. So that's the product. They're putting it together by sending faxes to people to get the information to sell to other people. It's like you're being recruited to be part of the team, except the doctor's office is paying for the fax. So if I want to get information from you to send to maybe other folks, third parties, and I'm using the data that I'm just asking you, if you want to provide it, you don't have to provide it. How is that an advertisement for either my services, in this case, or a product? In the case of Optum, it's a product. And they say it's their database product. So say somebody's putting together a database of. But I'm not advertising to you. I'm trying to get from you information that I can advertise to these folks out here. And you advertise the product to me in order to get me to respond. Just by making me aware of it's an advertisement. No. What it says is, as part of an ongoing data maintenance of our database, regularly contact health care practitioners to verify demographic data regarding your office locations, et cetera, et cetera. It's independent of and not related to your participation in any Optum network. Then it says the data is used by health care-related organizations to aid in claims payment, assist with provider authentication and recruiting, augment their own provider data, mitigate health care fraud, and publish accurate provider directories. In other words, I'm trying to get information out there so that I can advertise my product over here. Correct. So you advertise it to the people you want to participate and provide you information. But why is that for Dr. Malvey? How does he have standing to say that, hey, I'm the one that's being advertised to? I'm not trying to advertise anything. I'm trying to get information from you in order to use it elsewhere for my particular business. Right. The problem is that the TCPA says you can't send faxes to people to get information from them for your business. Where does it say that? That's what I'm saying. Where in the text does it say that? It does talk about surveys. That's in the FCC rules. Hold the rules. Tell us where you see this fitting in. The prohibition you just referenced. Where is it in the rules? The statute says. Read it to me. I have it here. Any material advertising the commercial availability or quality. Which paragraph are you in? That's in 47 U.S.C. 227A5. Okay. It's the definition of unsolicited advertisement. An advertisement is any material advertising the commercial availability or quality of any property, goods, or services that is sent to any person. So where are you advertising? That's not Optum's survey. Or not survey. Excuse me. Optum's request for data doesn't seem to fit within what you just read. Advertising means to make known to the public. They announced that their database exists. Among other things, it could mean make known. That's one of the definitions. We only know that they have this database because they say so on the fax. So they tell the people they're sending this fax to without permission that they have a database, they're putting it together, and they're going to license it to somebody else as a product, and they want you to participate. And if General Motors sent out a fax to everybody saying who wants to be part of our database of people who are interested in buying new cars, or some third party wants to put a database together of people who are interested in borrowing money to buy homes, just because it's a database doesn't make it innocent somehow. The whole point of it is for their business. Well, I agree. The whole point of it is for their business. They tell you that it's for their business. But how am I trying to sell a, in effect, enter into a relationship with you for you to get my products or services? I don't get it from the optimum. They're not proposing a direct commercial relationship between them and the recipients of the fax. And the second, sixth, and fourth circuits have all said that that's not part of the requirement. This court would be the first court to say that a fax is only an advertisement if it offers to sell something to the recipient of the fax. All right. Why don't we hear from Mr. Bachman, and then we'll get you back for your rebuttal. Mr. Bachman and Ms. Ellsworth. Good morning. May it please the court. Michael Bachman for defendant NIA and the NIA appeals. Your honors, Chief Judge Stengel is right to dismiss the complaint in this case because it is that this is not an advertisement. And the plaintiff doesn't plead any facts. Was there a prior relationship? Yes. What was it about? He contacted NIA in order to obtain pre-authorization services. So that entire business model, which he admitted to you today, it doesn't make sense. He's not a sales target of ours.  Before he can get paid, he needs to contact NIA to get approval on behalf of the insurance companies to conduct those tests. So this is almost like the opposite of an ad. It's not like we're reaching out to him to sell something. He reaches out to NIA to obtain payment. So in that make of his argument, just making the doctor aware of this organization is an advertisement. Well, then every business to business communication in America that's sent by facsimile would be an advertisement. And contrary to what he told you, that is not what the Sixth Circuit's held. It's not what the Second Circuit's held. No circuit's held that. A key predicate is if it's just out of the blue. Well, we know now because he's admitted, I think some games were maybe being played in the briefs, but we know now because he's admitted that this wasn't out of the blue. This was sent to him in relation to services that were provided in the past. And the FCC in a document that the plaintiff say is binding makes crystal clear. The transactional documents like that are not advertisements. If a document relates solely to a transaction that has occurred in the past, it is not an advertisement unless it's seeking to initiate some new transaction. And it's clear from the face of this facts that there was no effort to initiate a new transaction. Everything that is talked about is something that happened in the past. It is seeking input on a past transaction. And I think based on the concession we heard today, there is no argument that this comes outside of the FCC's guidance. And I think the court can decide on that basis alone that this is a transactional document, which the FCC in a document they say is binding is not an advertisement. What would Dr. Mott have to plead in order to adequately allege that a survey is a pretext for an advertisement? Well, he'd at least need to plead. I'm saying theoretically. Sure. He'd at least need to plead something which you can't hear that it's an effort to sell him something. Right. He wants to read the term advertisement out of the statute. And I think if you walked up to anyone on the street and you said advertise has been he is correct. You're opposing counsel that advertise in some definitions is to make known for the purpose of selling. Right. And I think the Sandusky court gave a great analysis of that, which is dead on. Right. Which is that it can't just be letting the public know about a about a good or service. Again, any business to business communication which mentioned someone's goods or services would be an ad. If I sent a letter complaining about the quality of goods and services on behalf of the client, is that an ad just because it mentions those goods and services? That doesn't make any sense. And let's assume there had been no previous transactions. OK. Would this be an ad? No, because at a minimum, he would need to plead that there was some effort to sell him something. Right. And he hasn't pled that. Well, if you if there was no prior relationship and you take the broad definition, which seems to be what the regulation wishes to do, and that broad definition might be to make known that conceivably could be an ad or at least a pretext for an ad. Right. I guess I would respectfully disagree that the definition is just to make known. I think it needs to be made known for the purpose of sale. And that's clearly what the Sandusky court held. And no, I don't know of a court of appeal that has said that just making known without any effort to sell something is is an advertisement. Because, again, I think that would sweep in way too much. Looking at the Oxford American Dictionary, it says advertise to make publicly and generally known to call public attention to in order to encourage people to buy. That's what you're talking about. Right. To issue a public notice, advertise, et cetera. But one of the three qualify things that qualify, isn't it? To in the definition of to advertise is to make publicly and generally known. Right. I would respect if that's the definition and I don't think it is. Then the 11th Circuit was clearly wrong in the Florence case because that involved a facsimile that was sent to a doctor to get approval to purchase a medical device. It mentioned the medical device. It made it known. But the 11th Circuit said, no, that's not an advertisement because the recipient of the facts was not a sales target. All I'm saying is if it looks as if the regulation desires to be fairly broad with regard to the types of things that they're trying to regulate. And I'll give you another example. Miriam Webster says advertise to make something known to notify to make publicly and generally known. So and I'd respectfully submit that that's not what Congress intended, because if Congress had intended to bar all commercial, all documents that mention a commercial transaction or mentioned goods and services, they would have had to use the term advertising. They could have just bought all of those things where Congress enacts what some would argue to be an opaque law. Right. And the entity that puts out the regulation to implement it puts out something that. From some people's perspectives, this is significantly broader. It fills in the gaps. Right. And again, I would respectfully submit that I don't think that the FCC in that order and regulation, which they say is binding, was adopting a definition that just said making known is sufficient, because let's look at some of the things that they said are not advertisements, receipts, documents that relate to a transaction that already occurred, surveys, Your Honor, unless it's a pretext to sell somebody something and a subscription renewal notice is not an advertiser. That clearly makes known the magazine. And not only that, but regulations say about surveys. It says that a survey is a pretext only if it is a I'm sorry, a survey is an advertisement if it's a pretext to an advertisement. Right. And the word advertised is sometimes used in a context that has nothing to do with selling. For example, a person might state my political views are with party X and somebody who's with party X might not want to do that. But he's advertising the fact that he's with party X and yet he's not trying to sell anything. What agreement? I think that all of the cases that have interpreted the term advertisement had included that, that requirement that it be done for some commercial purpose to sell something to the recipient. So I don't think that anyone has interpreted the statute that probably. And again, I think some of the questions that Judge Restrepo was asking, let's look at this facts here. It doesn't even promote the goods or services which are not even for sale to the plaintiff. It asks questions about them. And among those questions, it says it gives the recipient the opportunity to say that the services were wholly unsatisfactory. So it's difficult to think of a competent marketing person who would create an ad which gives the recipient the opportunity to disparage the products that are allegedly being, allegedly being marketed. All this is predicated on if there were no previous transactions, correct? If there were previous transactions, hard stop? That would, a hard stop, if there is a previous transaction, this case is over. And he's, again, I think that the briefing, they made this argument, well, there's this established business relationship and they suggested that maybe there wasn't any contact, which is not true. And they didn't plead that. And they've admitted to you today that that is true. So I think hard stop on our case, Your Honor. It's an easy decision for the court to find that this is within the transactional exception. So unless the court has any further questions. Judge Greenberg, any further questions? I could just tell you this. In my office here, I get faxes all the time trying to sell me a new roof for the courthouse, I guess. And then I get the same fax at home from the same person. Now, that's a real advertisement. I can't buy a new roof for the courthouse. Your Honor, it's funny, I got a fax this morning trying to sell me something, trying to have me improve my driveway. And I thought to myself, well, OK, this is an ad. And I would, that's what Congress had in mind, Your Honor. It didn't have in mind routine business to business communications that simply seek information about a service that was already provided. Isn't that fax to me for a new roof for my house or the courthouse, isn't that in violation of the law? I'm sure Mr. Bach would give you his phone number, Judge Greenberg. If they're seeking to sell you something, that is what an ad is. They're sure doing that. But we are not, Your Honor. And I think that's crystal clear based on what's in the fax itself, what's in the complaint, and what we heard from plaintiff's counsel today. All right. Thank you very much. Thank you. Ms. Ellsworth. Good morning, Your Honors, and may it please the Court, Jessica Ellsworth on behalf of Optum. Was there any prior relationship between Optum and Dr. Mouthing? Your Honor, this is a summary judgment case, and there is nothing in the record that demonstrates any existence of a prior relationship. Okay. So then that part is out. So the question there is, in effect, is the request for data that you're going to use and for other purposes, is that under the TCPA and the regulations an advertisement or the pretext for one? Your Honor, I agree. And I think that this is a summary judgment case in which the plaintiff had every opportunity to develop a record that showed some facts, that showed that this was, in fact, an advertisement or a pretext for an advertisement. And you won't find that in the record. It's telling, I think, in a summary judgment case that if you look at the reply brief here, there is not a single citation to anything in the record. There are all sorts of broad statements about why the Court should conclude that this is an advertisement, but there aren't any record citations. How much discovery was there in this case? The district court allowed limited discovery on the issue of whether this was an advertisement or a pretext, and the plaintiff chose to take two fact witness depositions of the two individuals whom Optum identified as having relevant knowledge  All right. I could offer, Your Honor, four reasons that I think go to the question about what the scope is that Congress intended, and I think that show there's a narrower scope than the commercial purpose or the broad definitions of advertise, which might include simply to make known. The first thing I'd point to is the provision of the TCPA involving robocalls. The TCPA doesn't just govern faxes. It also governs telephone calls, and it bars telephone calls that are made by an auto dialer. And then it goes on to allow calls that are made for a commercial purpose, as long as they do not include the transmission of unsolicited advertisements. And I think if you look at that statutory provision, it's 47 U.S.C. 227B1B and B2B, and there's an FCC. That's obviously not our case here. It's not our case, but it does show that Congress knows that commercial purpose and advertisement have a different scope. And what specifically relates to faxes that you can aid us with? So in 2005, when this provision that's at issue related to faxes was added, Congress used the word advertisement. It didn't use the broader term commercial purpose, which was already in the statute in the robocall provision. The second thing that I would point to is the FCC regulation. And although, as Your Honor noted, the FCC regulation does take a very broad view of the statute, the statute appears to just talk about the face of the document. And the FCC rule talks about looking behind that to pretext. But even in the pretext context, the FCC says that what you're looking for is whether the pretext means the fax was, quote, part of an overall marketing campaign to sell property goods or services. So it's linking it to the effort to sell property goods or services. You can see that at 71 Fed Reg 25973. Well, couldn't an argument be made that the mere bringing this to the doctor's attention is an effort to sell optum to the doctor, or optum services to the doctor? There are a couple reasons I think that that's not the case. And I would also note that that's not an argument that the plaintiff has ever made, didn't seek to develop in discovery, and wouldn't have any evidence to try and avoid summary judgment on. But the fax on its face says this is not an attempt to sell you anything. When he took discovery, discovery confirmed. Optum wasn't intending to sell him anything through this fax and doesn't, in fact, sell anything to providers. The fax also says that data is part of an ongoing data maintenance initiative. It says that twice. So not only does it disclaim being an effort to sell, but it explains what it is. It's a data initiative. And I think it's telling that if you look at the relator's reply brief, what he says is that this fax is shifting, quote, communication costs and, quote, data collection costs to individuals like his client. But the TCPA is not concerned, frankly, about data collection costs. It's concerned with advertising costs. Legislative history, and this is the third of the four points that I think support. You're saying an advertisement cannot be a message that aims to acquire something of value, which in this case would be data? That's right, Your Honor. I think advertising is an attempt to promote a good for sale. And there's not an attempt to do that here. And, frankly, I think Dr. Malvi acknowledges that. At this point, having taken discovery, Optum was not trying to sell him this database by sending the fax. And this fax was not a pretext. It wasn't somehow paving the way for other things that Optum was going to sell him. It is exactly what it says on its face, and that's what Judge Smith said below in granting summary judgment. It was an effort to verify data that Optum already had. It uses 600 sources. It says that in the FAQs that are attached to the complaint, and one of the witnesses said the same thing at his deposition. There are 600 sources that go into putting this database together. One of those is some fax outreach directly to providers. There's also telephone outreach to providers. There is looking at providers' websites. And then there's all sorts of information collected from state medical boards, from CMS, from state licensing boards, to confirm what doctors have been sanctioned and may have lost their medical licenses. This is an effort to have an accurate product, to have accurate data. But simply asking Dr. Malvi to verify the address is not an effort to sell him anything, and it wasn't trying to pave the way to sell him anything. In fact, discovery confirmed there was not a second effort to contact him made in any way. There was no further attempt at outreach. The data is sold to a third party. Is that right? The data is available. Available to somebody that's interested in that data. That's right, Your Honor. And they have to pay for the information. That's right, Your Honor. So it's at least one step removed from the individual that provided the information. Is that right?  That's correct, Your Honor. That's correct, Your Honor. And, in fact, the other thing that the fact says, I think, is relevant, that it says that this data request is independent of and not related to being in an Optum network. So, yet again, underscoring this is not about a commercial relationship in any way between the provider and between Optum. The last thing that I would mention, and it's the fourth of the four reasons I said this court should not accept the broad commercial purpose definition that's being offered by the plaintiff here, is the First Amendment. To the extent that this statute really were interpreted by this court to bar communications from businesses writ large, because any communication from a business, let's be honest, businesses are doing things for business purposes. They want to stay in business. If this statute barred business communications, it would raise a very significant First Amendment problem. And I think that's why the courts that faced First Amendment challenges to the statute focused on the fact that the statute was prohibiting advertising and that that narrower view, that what's at issue here is advertising, not all business communication, is what allowed those courts to have comfort that it could uphold the statute. The last aspect of this case is currently before the Supreme Court in the Carlton. Is that correct? Yes. In Carlton, the Supreme Court is looking at the issue of whether district courts have to defer to the FCC's 2006 rule under the Hobbs Act. In this case, in our case, in Optum's case, the district court did defer to that rule. But given that the rule is really about prophylactic, it's a prophylactic rule about free goods and services, and Dr. Mowdy has never argued that the facts in this case fit within the prophylactic rule. We think at most the Supreme Court's decision is likely to be of limited value. And if anything, it would allow this court to determine whether it thinks the pretext inquiry is even an appropriate one under the statutory language. Your honors have no further questions. Thank you. Judge Greenberg, do you have any further questions? No. Okay. Thank you very much. Let me just ask you, I'll just say I call around. I'm trying to get information for a directory for possible patients as to what the services are provided. But when I do give that information to others, I want to make sure I have the correct information, what the practice actually does, what it doesn't do, where it's located, its phone numbers, et cetera. If I call Dr. Mowdy in order to get or send a fax in order to try to get that information, am I in violation of the TCPA and its regulations? If you're doing it because you're going to sell the information to other people. Yeah. I'm going to give them accurate information with respect to doctors in their area as to what their services are and where their locations are. I just want to make sure they haven't moved, what the telephone numbers are, et cetera. Yeah. Yeah. If Dr. Mowdy sent that fax to you telling you what he does and where he is and how to find him, that would be an ad. So when you contact him asking him to give you that information so you can sell it to somebody else, it's an ad. That's a bridge pretty far, isn't it? Not really. I mean, think of how many faxes, just these two examples, how many you have to have another fax machine to receive all the people putting databases together. How am I advertising to you my services when I do that? If it was just a form that said name, address, practice, and that's the only thing that showed up. I'm not making anything about me. I'm trying to sell to the Restrepos and the Greenbergs of the world. And so Optum does that. They sell themselves to the doctors in order to get the doctors to respond. They tell them what the product is, why they should participate, what it's going to be used for, who they're going to sell it to. Maybe in a vacuum, that's fine. It's just one company, one time doing this. But if everybody else does this, the doctors are going to get surveys about everything, how's the vacuum cleaner working, everything else, all by fax. Was there a previous transaction between your client and NIA? I don't know about definition of a transaction. Did they do any business? No. I don't know business. There was a previous preauthorization inquiry, is that correct? Preauthorization to have a radiologist do services. The council says it was for Dr. Maldi to get paid. I haven't seen any evidence. It's for Maldi to get paid. It's for Maldi's patient to get services from another provider. So you're trying to get something in the marketplace. Dr. Maldi is trying to get something in the marketplace, a preauthorization. If a patient has insurance, your insurance will only pay for radiological services that are preauthorized by somebody. In this case, it was NIA. So NIA responded back, right? They must have. And if they responded back and you get a survey from them and ask how was what we did, how was our response, it's like taking your car to Lexus and they send you surveys afterwards. How was our service? Well, you're putting it into the time of the transaction. If it's something, hey, Dr. Maldi, did you get those records we sent you? Something like that. That's different. This is a generic survey they sent to everybody. But did your client reach out to them with respect to a preauthorization? His office. The office must have, yeah. So there was some sort of transaction. Okay. And what happens when you're sending a fax on the basis of a transaction is you have to have an opt-out notice. The statute, the TCPA statute specifically says you can send advertisements to people with whom you have a prior existing business relationship. But if you do it without an opt-out notice, it's an unsolicited advertisement. So counsel now says that it's like they're trying to fit within the transactional exception in the FCC rules. And the FCC rules are clear that it must be an ongoing transaction. It's in the transaction. It would be something that says, did you get the information we sent you? It can't be months later, how did you find our services and how fast were we and did you even contact us and everything else. It's just a generic survey they sent to everybody. And their argument is that they have transactions in the past with people. And that's when you need an opt-out notice. The Optum Inc fax, sorry, Your Honor. I was going to say, go ahead. The Optum Inc fax is almost the exact same fax that was found to be an advertisement in, or at least state a claim about an advertisement in Fulton v. Inclarity. It's the same thing. It's another company that puts together databases sending faxes to people. In that case, it was Inclarity's LexisNexis. No court has, I'm not aware of any court that has said the definition of advertisement requires that the fax is trying to sell something to the recipient. That it's only if you're selling to the recipient is an advertisement. If you only send it to people who aren't going to be your ultimate purchaser, then it's not an ad. The Bowringer Court, the Second Circuit, that was about a seminar for doctors. And the question was whether they were going to talk about the pharmaceutical during the seminar. And the pharmaceutical company wouldn't be selling pharmaceuticals to the doctor. They were hoping the doctor would prescribe it to the patient. The patient would go to a pharmacy. So it's a broad commercial relationship. It's not just one-to-one. Only if it's a one-to-one relationship is it an ad. And the reason the statute is so broad is because they were trying to stop junk faxes. If somebody received one of these in the mail, they would think it's junk mail. This is a junk fax. It's something that they sent for their own benefit. Probably most people throw it in the garbage because it's garbage. Well, you don't have to respond to the survey. If there's a prior, whether it's a transaction or an interaction or something like that, and they're sending something to you asking, let us know if you feel like it, how we did, you know, it's not as close as one might think to being within the purpose of this particular statute. Well, it's just a creative, it's just a nuance. It's, you know, consumer goods companies all the time want people to give feedback and answer surveys. And my question to you, I'm only talking about NIA as to Optum. They're merely trying to get data. Well, data that they can sell. It's for their business. They're not trying to get data about political campaigns. I understand, but they're not trying to sell you any data or let you know that they even make known that they get data for you to use, in effect. I mean, I think Optum's got a very strong case. Their argument is they can fax whatever they want as long as they're not trying to sell it to the recipient of the fax. And that's not what, no court has said that. All right. Thank you very much. Thank you, Your Honor. Thank you to all counsel for very helpful oral arguments, and we'll take the matter under advisement.